IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JACK "JAY" PALMER, JR., )
 )
  Plaintiff, )
 )
v. )  Case No.  2:11-CV-217-MHT
 )
INFOSYS TECHNOLOGIES LIMITED )
INCORPORATED, )
 )
  Defendant. )
 )

## PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

I.  THE PARTIES

 A. Defendant Infosys

Infosys Limited (NASDAQ: INFY) was started in 1981 and is one of the largest consulting, technology and outsourcing companies in the world. The company is headquartered in Bangalore, India. Infosys employs over 130,000 people worldwide. Infosys' clients include Wal-Mart, American Express, Johnson Controls and Goldman Sachs, to name a few.

 B. Plaintiff Jack "Jay" Palmer, Jr.

Plaintiff Jay Palmer Is an Alabama resident who had been in the Information Technology field for many years. In August 2008, he accepted a job at Infosys as a Principal Consultant in the Enterprise Solutions Practice.

II.    THE WITNESSES

A. <u>Jeffrey Friedel</u>—An Infosys in-house lawyer who serves as the global head of employment law and works out the Bridgewater, New Jersey office. He was directly involved in Mr. Palmer's Whistleblower claims.

B. <u>Nandita Gurjar</u>—Head of Infosys' Human Resources Department global wide and also serves on Infosys' Executive Council which is a level below the Board and is responsible for key functions in the organization.

C. <u>Lisa Kidd</u>-- Associate Vice-President of Human Resources who oversees all of the talent acquisition team, compensation and benefits, employee relations, compliance and immigrations for the Americas, which includes the United States, Canada, Mexico and Brazil.

D. <u>Lynne Grant</u>-- Manager Employee Relations in Infosys' HR Department. Ms. Grant works in the Plano, Texas office where her job focuses on dealing with issues that employees have with their manager or some of their conditions of employment, Ms. Grant was in charge of investigating Mr. Palmer's harassment and retaliation claims.

E. <u>Mitch Allen</u>—A Birmingham lawyer who was retained by Infosys to investigate Mr. Palmer's claims of harassment, retaliation, and discrimination.

F. <u>Linda Manning</u>—Currently works at the University of Texas at Arlington in immigration. She was employed by Infosys in its Human Resources Department from 2008 until 2011 where she witnessed crimes and the retaliations to Mr. Palmer.

G. <u>Paul Gottsegen</u>—An Infosys Vice-President, with the title Chief Marketing Officer. He also serves as an official spokesperson for Infosys and was responsible for releasing a press statement accusing Mr. Palmer of lying to the United States Senate Judiciary Subcommittee on Immigration, Refugees and Border Security.

H. <u>Marti Harrington</u>-- Former employee of Infosys who managed the Johnson Controls' project from July 2010 until she resigned.  She reviewed documents proving Infosys had employees working illegally at Johnson Controls and also filed a Whistleblower Complaint related to this illegal conduct. She also witnessed harassment to Mr. Palmer.

I. <u>Stephanie Teasdale</u>—Hired by Infosys to develop and implement its Affirmative Action program in order to obtain contracts with the United States government. She testified that she left Infosys because Infosys never had a desire to be Affirmative Action compliant. She witnessed deliberate retaliation against Mr. Palmer by Infosys' HR Department.


III.    IMMIGRATION LAWS

In order the appreciate the motives of Infosys to discredit, intimidate or otherwise attack Mr. Palmer, a brief review of Immigration law needs to be addressed.

The United States has imposed various forms of immigration control dating back to the Naturalization Act of 1790. In 1952, Congress enacted the Immigration and Nationality Act, (INA), also known as the McCarran-Walter Act, 8 *U.S.C.A.* §1101,

3

*et.seq.*, which codified many existing provisions and reorganized the structure of immigration law.

Among other things, the INA sets forth conditions for the employment of aliens in the United States and includes provisions related to employment eligibility and employment verification. It also sets out specific immigrant and nonimmigrant classes. The crimes committed by Infosys that were discovered and reported by Mr. Palmer relate to 2 nonimmigrant classifications--"business visitors" who come to America on B-1 visas and "specialty workers" who come on H-1B visas.

A "business visitor" (B-1 visa) is defined by the INA as "an alien ... having a residence in a foreign country which he has no intention of abandoning and who is *visiting* the United States temporarily for *business*.... 8 *U.S.C.A.* §1101(a)(15)(B). "The term "business," refers to conventions, conferences, consultations and other legitimate activities of a commercial or professional nature. *It does not include local employment or labor for hire.*" 22 *CFR* 41.31(b)(1) (emphasis added)

A "specialty worker" (H-1B visa) is an alien ... (b) who is coming temporarily to the United States to perform services ... in a specialty occupation ..." 8 *U.S.C.A.* §1101(a)(15)(H). In order to qualify for an H-1B visa, the employee must at least possess "a theoretical and practical application of a body of highly specialized knowledge," and have "a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 *U.S.C.A.* §1184(i) (1)

The process for obtaining an H-1B visa is by design, very exhaustive. Before filing an H-1B visa petition, the employer of a prospective H-1B worker must first file

a Labor Condition Application (LCA), Form ETA 9035, with the Department of Labor. 20 *C.F.R.* §655.730 also requires employers to attest to their obligations to not displace American workers through the use of foreign temporary workers.

The INA has been amended several times to among other things, limit foreign workers and protect American jobs. The amendments pertinent to this matter include the *Immigration Reform and Control Act* (IRCA) of 1986 which increased criminal sanctions for employers who hire illegal aliens; the *American Competitiveness and Workforce Improvement Act of 1998* (ACWIA) which  temporarily increased the annual H-1B visa cap, but was later amended to limit the total number of aliens who could be issued visas or otherwise provided nonimmigrant status during any fiscal year to 65,000 starting in 2004, 8 *U.S.C.A* §1184(g)(1)(A); and, most importantly for this case, Public Law 111-230 which went into effect on Aug. 13, 2010 and increased H-1B petition fees by $2,000 for "H-1B Dependent Companies" such as Infosys. This new law raised the filing fees for each H-1B visa petition to $4,325. *See,* Form M-735, Optional Checklist for Form I-129 H-1B Filings- http://www.uscis.gov/files/form/m-735.pdf. On the other hand, the filing fee at that time for a B-1 visa was only $140. *See,* *http://travel.state.gov/visa/temp/types/types_1263.html*. Thus, the fee to Infosys for an H-1B visa was over $4,000 more than for a B-1 visa.

Pursuant to 8 *U.S.C.A.*1324a, every employer must complete and retain an I-9 Eligibility Verification Form for each individual they hire for employment in the United States, including noncitizen aliens. The employer must examine evidence of the identity and employment eligibility and certify, under penalty of perjury, that the employee is authorized to work in the United States. This statute also makes it "unlawful for a person

or other entity to hire, or to recruit or refer for a fee, for employment in the United States

an alien knowing the alien is an unauthorized alien with respect to such employment

IV.    FACTS

    A.   Palmer Learns of Infosys Illegal Conduct.

      In March of 2010, Mr. Palmer was invited to Infosys Headquarters in Bangalore,

India for planning meetings in his Enterprise Solutions Division. Mr. Palmer was the only

American invited from his Practice. During these meetings, Infosys' managers expressed

concerns about the visa caps, increased fees for H-1B visas and other restrictions the

United States had placed on immigration. (Exhibit 26 -- Palmer Affidavit)

      Infosys' managers actually referred to the situation as a visa "crisis" and

discussed the need to and ways to "creatively" get around these H-1B restrictions to work

the system in order to increase profits and the value of Infosys' stock. There were many

side and off the record conversations between Indian Delivery Managers and U.S. based

Engagement Managers where they discussed that Infosys needed to increase the use of B-

1 visas and send lower level and unskilled Indians to the United States. In this way,

Infosys could avoid the restrictions imposed by the United States and also fulfill the high

demand for its customers at a lower cost and increased profits for Infosys. (Exhibit 26--

Palmer Affidavit)

      The Infosys Managers also discussed the fact that the United States government

had difficulty tracking B-1s once they entered our country and therefore would not be

able to determine if the B-1s attended meetings, as represented by Infosys or were

actually illegally working at client sites. One Infosys manager even stated that "no one would ever know." (Exhibit 8 -- Palmer Affidavit)

B.   Palmer Told to Write Fraudulent "Welcome Letters."

In May of 2010, while working at Baker, Hughes in Houston, Mr. Palmer's managers, Neeraj Saxena and Deepak Hangal, told Mr. Palmer that the U. S. Consulate in India was rejecting many of the B-1 visa applications due to the large number of applications Infosys was submitting. Mr. Palmer also was told that the Consulate had informed Infosys that in order to obtain B-1 visas in the future, it needed to have Americans or American Companies issue "Welcome Letters" to verify that the employees were coming to the United States for legitimate B-1 purposes. Neeraj, Deepak and Gopi Krishnan, Mr. Palmer's manager in India, instructed Mr. Palmer to write these "Welcome Letters."

The "Welcome Letter" was a template on Infosys' internal website that was basically a fill-in-the-blanks form letter. (Exhibit 32) Mr. Palmer reviewed the form letter and became very concerned because the contents of the letter falsely stated that the foreign employees were coming to the United States for a "visit" at one of Infosys' facilities, which would be a legitimate B-1 activity when in fact, they were coming to "work" at client sites, which is illegal. The "Welcome Letter" template also contained a "Do's and Don'ts" page providing instructions on "filling in the blanks" on the letter and directions to the B-1 employees as to how to avoid detection when entering the United States. (Exhibit 32 and Exhibit 2 to Manning Deposition) Some of the instructions included in the "Do's and Don'ts" are as follows:

"Do not mention activities like implementation, design & testing, consulting, etc., which sound like work.

Also do not use words like, work activity, etc. in the invitation letter. DO NOT TELL THEM YOUR WORKING. Speak little English.

Please do not mention anything about the contract rates as your on a B-1 Visa"

C.   <u>Palmer Contacts HR</u>

Because of his concerns about the "Welcome Letters" and the fact that Mr. Palmer now understood it was illegal for B-1 employees to "work" at client sites, Mr. Palmer called Linda Manning in Infosys' HR Department. Ms. Manning had an extensive background in immigration prior to joining Infosys including working in immigration at KPMG. (Exhibit7--Depo. Manning p.6) There she worked directly with Fragomen, Del Ray, Bernsen & Loewy, the biggest immigration law firm in the United States with worldwide offices, and was trained by one of its paralegals. (Exhibit 7--Depo. Manning p.79) Ms. Manning also handled the I-9s for foreign nationals at KPMG.

Prior to Mr. Palmer's telephone call, Ms. Manning also had discovered that there were B-1 employees illegally working at client sites. (Exhibit 7--Depo. Manning p.17) According to Ms. Manning, there were four and five cases where she actually had e-mail proof of B-1 violations. Ms. Manning testified about one case where an employee called and told her he was on a business visa, but when she asked Infosys' Immigration Department about him, Abijit Sandgal, a member of the Immigration Team, lied to her and told her that the employee was in the U.S. on an H-1B visa. (Exhibit7--Depo. Manning p.28)

Ms. Manning stated that when Mr. Palmer called and told her that he had an employee working at his site on a B-1 visa, she "just went ballistic." She "wasn't that

shocked, but was angry." Ms. Manning started explaining more about immigration law to Mr. Palmer She also looked on Infosys' internal website regarding the B-1 visas, "Welcome Letters" and "Do's and Don'ts." (Exhibit 7--Depo. Manning p.20) Ms. Manning confirmed to Mr. Palmer that these B-1s employees could not come to the United States to "work" on B-1 visas at client sites.

D.  Palmer Refuses to Write Welcome Letters and is Chastised and Threatened

When Mr. Palmer refused to sign the "Welcome Letters" he was instructed to join a conference call with 2 of his supervisors, Gopi Krishnan and Indranil Mukherjee. They told Mr. Palmer that if he did not sign the letters, it would drastically affect the company's profit because Infosys did not have people in the United States to complete the work. They threatened that it would affect Mr. Palmer's salary and standing in the company and stated that Indian managers would not want to work with Mr. Palmer in the future. When Mr. Palmer tried to explain that this was illegal, he was chastised for not being a "team player." (Exhibit 8, Palmer Depo. pp. 169-171) (Exhibit 26, Palmer Affidavit)

Shortly after this telephone conference, Mr. Palmer was transferred to the Heidrick & Struggles project in Chicago, Illinois. Within a few days, Mr. Palmer learned that there were Infosys B-1 employees illegally working at this project as well. One of the B-1 employees was Vishal Gaur. Mr. Palmer obtained a copy of the "Welcome Letter" used to bring Mr. Gaur to the United States. (Exhibit 19) The letter, which was signed by an Infosys Indian Engagement Manager, falsely stated that Mr. Gaur was coming to the

United States for "business meetings and workshops" at Infosys' offices in Lisle, Illinois, when in truth, he was working at Heidrick & Struggles in Chicago, Illinois.

### E.  Infosys Tells Palmer to "Keep Quite"

In September of 2010, Anjali Yadav, an Infosys Indian Delivery Manager came over from India to talk to Mr. Palmer and requested that Mr. Palmer "keep quite." Ms. Yadav stressed that it was important to the profits of Mr. Palmer's division, to his Delivery Managers and to Infosys from a financial standpoint to continue to do business this way. Ms. Yadav also told Mr. Palmer that if Infosys was not able to send B-1s to the United States, it would not be competitive in the market place and could not deliver on American contracts. (Exhibit 26, Palmer Affidavit)

### F.  Palmer Refuses to Rewrite Contracts and Submit Invoices for B-1s

Infosys had two types of contracts; "Time and Material" (T&M) and "Fixed Price" (FP).  On a T&M contract, the employees doing the actual work are identified to the client along with their hourly rate. On a FP contract, a customer is charged a lump sum for labor and the employees who are actually doing the "work" are not named. Infosys apparently became concerned about specifically identifying illegal B-1 visa holders and charging an hourly rate for their work in a written T&M contract. (Exhibit 26, Palmer Affidavit) Mr. Palmer received emails and requests to rewrite T&M contracts to FP contracts, but he refused. He was also instructed to send invoices, called Milestones, to clients for work performed by illegal B1s, including Mr. Gaur. Mr. Palmer protested and even sent an email to in-house counsel Friedel and HR Manager Manning

pointing out that this was illegal. Mr. Palmer requested guidance, but received none. (Exhibit 2-Fridel Deposition, Exh 9)

### G.  Palmer Reports Violations To Infosys' In-House Counsel

Mr. Palmer had reported the illegal conduct to HR and in October 2010, Ms. Grant decided that these issues needed to be escalated to Mr. Friedel, Infosys' corporate counsel. (Exhibit 4, Depo. Grant p.21) A conference call was set up for Mr. Palmer, Mr. Friedel, Ms. Grant and Ms. Manning. (Exhibit 7--Depo. Manning p.26-28)

Later in October, Mr. Palmer was on a call with Mr. Friedel where they again discussed the violations. Mr. Friedel told Mr. Palmer to file a Whistleblower Complaint and said he would protect Mr. Palmer. (Exhibit 8--Palmer Deposition p. 136)

### H.  Palmer files Whistleblower

In 2002, Congress passed the Sarbanes-Oxley Act of 2002 (SOX), 15 *U.S.C.A* §7201, *et. seq*. largely in response to the corporate scandals by the Enron and others. On April 9, 2003, Infosys' adopted a Whistleblower Policy to be "in line with the requirements of the Sarbanes-Oxley Act, 2002." (Exhibit 33, p. 1) This Infosys policy provides that if an employee "has reason to believe that you have become aware of grave misconduct, you must immediately report those facts to your immediate supervisor or to the corporate counsel." "Grave misconduct" is defined by the Policy to be "conduct which results in a violation of law by the company. . . and if proven constitutes a criminal offence . . ." (Exhibit 33, p. 2) The policy also sets out that Whistleblower Complaints are to be sent to "whistleblower@infosys.com" and also states that Infosys "strictly prohibits

any discrimination, retaliation or harassment" of any employee who files such a report. (Exhibit 33, p.4)

On October 11th 2010, in accordance with Mr. Friedel's instructions and in compliance with Infosys' Whistleblower Policy, Mr. Palmer filed an Internal Whistleblower Complaint in regards to the illegal activities including B1 Visa Fraud and illegal I-9 activities. Ms. Manning testified that she also was getting very concerned. She realized that she and Mr. Palmer were being ignored.  When Mr. Palmer told Ms. Manning that he was going to file a Whistleblower Complaint, she started looking into it and looking into the protections that were supposed to be provided to Whistleblowers and decided to file a Whistleblower Complaint as well. (Exhibit 7--Depo. Manning p. 34)

It is undisputed that Mr. Palmer's Whistleblower Complaint complied with Infosys' rules and the law. (Exhibit 4--Depo. Grant p. 33) (Exhibit 2--Depo. Friedel p. 27) Ms. Grant even sent Mr. Palmer an email where she said "please do not think that you have caused trouble by raising your concerns. You have done the right thing!" (Exhibit 4--Depo. Grant p. 39) (Exclamation point included in original) Mr. Friedel also thanked Mr. Palmer for reporting the violations. (Exhibit 2 --Depo. Friedel p. 101)


I.   Palmer Provides More Information of Illegal Activities

Mr. Palmer continued to provide Mr. Friedel and HR with additional information including spreadsheets that showed where illegal Infosys employees were working. He also sent information where Infosys Managers were intentionally committing fraud to avoid paying federal, state and local taxes. In an effort to help Infosys comply with the law, Mr. Palmer submitted a presentation on how Infosys could correct the illegal

conduct and insure compliance in the future. (Exhibit 8—Depo. Palmer pp.125, 126) (Exhibit 2-- Depo. Fridel pp. 129-131 and Exh. 39 to deposition) Ms. Manning also set up a business plan to clean up this problem, which included unannounced to the client sites to obtain immigration documents and if an employee was on a B-1, he would be sent back home and the manager would be reprimanded. Her recommendations were also ignored. (Exhibit 7--Depo. Manning pp. 29-37)

Mr. Palmer also flew to Texas to meet with Ms. Manning and Ms. Grant. Mr. Palmer and Ms. Manning told Ms. Grant what they "figured out- was going on." They also discussed ways to go about solving this problem. (Exhibit 7--Depo. Manning p. 28) Interestingly, when asked about the meeting, Ms. Grant testified that she did not remember hardly anything about the meeting. What is most disturbing about her lack of recall is that Ms. Grant executed the Interrogatory answers (Exhibit 13), was in charge of investigating Mr. Palmer's harassment and retaliation claims (Exhibit 4--Depo. Grant p. 47) and was one of only four witnesses identified by Infosys in its initial disclosures.

Mr. Palmer also independently researched and documented that Infosys had illegal people on several of his projects the entire time he worked for Infosys. John Murphy, Infosys' Program Director at Wal-Mart confirmed to Mr. Palmer that Infosys had illegal B-1 workers at Wal-Mart. (Exhibit 8--Depo. Palmer p. 207)(Exhibit 26-- Palmer Affidavit) Marti Harrington, Infosys' Manager on the Johnson Controls project, also informed Mr. Palmer that there were B-1s working illegally at Johnson Controls. (Exhibit 17--Harrington Affidavit) Ms. Harrington had a list of Infosys employees on the JCI project with their visa status and sent the list to Mr. Palmer. (Exhibit 22) This spreadsheet also had the names of people in India with B-1 visas who were "ready to

travel" to work in the United States. These employees were not coming to the United States for meetings, but to work in full time jobs.

J.   Infosys admits to violations

In response to Plaintiff's Interrogatory number 6 asking what Infosys did to investigate Mr. Palmer's Whistleblower Complaint, Infosys stated that Mr. Friedel's email of December 8, 2010 "explains the determination made by Infosys at that time regarding the issues raised by the plaintiff." (Exhibit 14) In that email, Mr. Fridel stated that "the issues that you reported to us have made it clear to management that certain changes need to be made to our systems and processes to prevent the misuse of the BV program." He also stated that "obviously there are still other aspects of this that are ongoing (i.e. discipline for those that are found to have violated company policy/law; Jay's desire to change groups etc.) and this e-mail is not meant suggest that this investigation or action is complete." (Exhibit 16)  However, Mr. Friedel has not sent any other e-mails to Mr. Palmer letting him know of any other determinations that the company has made. When asked about his follow-up and whether anyone was in fact disciplined for violations of company policy/law, he refused to answer the question. (Exhibit 2 --Depo. Friedel p.  )

K.  Retaliation

Shortly after filing his Whistleblower complaint Mr. Palmer received some disturbing phone calls during the middle of the night, one of which was answered by his wife. One of the calls came from Infosys' office in Bangalore. (Exhibit 8--Depo. Palmer

p. 182) He also received a couple of threatening calls on his cell phone. On one the calls, the Indian caller stated "why are you doing this, you stupid American, we have been good to you." (Exhibit 8--Depo. Palmer p. 179) Mr. Palmer reported these calls to Mr. Friedel and Ms. Grant. (Exhbit 8--Depo. Palmer p. 173)

Two months later, in December of 2010, when bonuses were paid, Mr. Palmer did not receive his bonus. He learned that the very supervisors who Mr. Palmer reported for illegal conduct failed to complete the evaluation form on Mr. Palmer that was required for bonuses. When Mr. Palmer checked on the status of his bonus, he was told by two of his supervisors, Sachin and Gopi, that he was not going to get his bonus because he filed a Whistleblower Complaint. (Exhbit 8--Depo. Palmer p. 94, 97)

Ms. Grant confirmed in her deposition that when Mr. Palmer reported the retaliation and harassment, it was HR's responsibility to investigate the charges. (Exhibit 4--Depo. Grant p. 31, 47) She also admitted that she was in charge of the investigation; however, she could not remember what she did during this investigation.  (Exhibit 4--Depo. Grant p. 47)

L.   Palmer Reports Crimes to Federal Authorities

Mr. Palmer eventually realized that Infosys was not going to cease the illegal conduct nor the retaliation and harassment. Therefore, he retained the undersigned attorney. On behalf of Mr. Palmer, the undersigned reported the crimes to an IRS Special Agent in Montgomery. It is important to note that Infosys' own Whistleblower Policy provides for the reporting of crimes to the appropriate agencies. (Exhibit 33, p.4)

Since Infosys' Immigration Team and the I-9s are in Infosys' office in Plano, Texas, the investigation transferred to the Eastern District of Texas and an investigation

team comprised of Special Agent with the Department of Homeland Security and State Department was formed. Mr. Palmer met with the investigators and showed him the documentation he had on his company laptop proving the crimes. The agents requested that he secure the laptop until they could take the required steps to take possession of the laptop. (Exhibit 8--Depo. Palmer pp. 60, 61, 119, 120) (Exhibit 26—Palmer's Affidavit)

In its 6-K Form filed with the Security and Exchange Commission for the quarter ending March 31, 2012, Infosys acknowledged that it is the target of a Grand Jury investigation. (See, Exhibit 3—Depo. Gottsegen, Exh. 4) Specifically, Infosys stated the following:

> On May 23, 2011, we received a subpoena from a grand jury in the United States District Court for the Eastern District of Texas. The subpoena requires that we provide to the grand jury certain documents and records related to our sponsorships for, and uses of, B1 business visas. We are complying with the subpoena. In connection with the subpoena, during a recent meeting with the United States Attorney's Office for the Eastern District of Texas, we were advised that we and certain of our employees are targets of the investigation. We intend to have further discussions with the U.S. Attorney's Office regarding this matter, however, we cannot predict the final outcome of the investigation by, or discussions with, the U.S. Attorney's Office.

> In addition, the U.S. Department of Homeland Security ("DHS" or the "Department") is undertaking a review of our employer eligibility verifications on Form I-9 with respect to our employees working in the United States. In connection with this review, we have been advised that the DHS has found errors in a significant percentage of our Forms I-9 that the Department has reviewed. In the event that the DHS ultimately concludes that our Forms I-9 contained errors, the Department would likely impose fines and penalties on us. At this time, we cannot predict the final outcome of the review by, or the discussions with, the DHS or other governmental authority regarding the review of our Forms I-9.

> In light of the fact that, among other things, the foregoing investigation and review are ongoing and we remain in discussions with the U.S. Attorney's Office regarding these matters, we are unable to make an estimate of the amount or range of loss that we could incur from unfavorable outcomes in such matters.

In the event that any government undertakes any actions which limit any visa program that we utilize, or imposes sanctions, fines or penalties on us or our employees, this could materially and adversely affect our business and results of operations.

This document shows that Infosys is being criminally and administratively investigated

for the very crimes that Mr. Palmer reported to Infosys HR, corporate counsel and

Whistleblower and for which he has and continues to suffer retaliation and harassment.


### M. Palmer Files Suit

On February 23th, 2011, Mr. Palmer filed this civil suit against Infosys in

Lowndes County, Alabama which was removed to this Court. Within a couple of days,

the complaint was picked up and published on the web by a service called

"www.courthousenews.com." News of the lawsuit spread fast in the tech industry.

(Exhibit 26, Palmer Affidavit )


### N. Palmer Receives Death Threats.

On the following Monday, February 28, 2011, Mr. Palmer reported to his

assignment at Axis Capital, where he found a note on the keyboard of his computer that

said

"just leave, you are not wanted here, hope your journey brings you death"

(Exhibit 8--Depo. Palmer p. 229) (Exhibit 9) When he turned on his computer at his desk,

a Word document appeared on the screen with the same threat typed out. Infosys

controlled the network at Axis Capital, so all the Infosys people that were on staff there

had access to his computer. (Exhibit 8--Depo. Palmer p. 230) The only conclusion is that

this threat was made by an Infosys employee.

On April 21, 2011, Mr. Palmer received another death threat which stated

" if you make cause for us to sent back to india we will destroy you and yuor family"

(Exhibit  10)

On May 25, 2011, Mr. Palmer received a death threat through his LinkedIn account from Vinodbhai Mankar that stated as follows:

Subject: infosys

"you still working at infy ? they should have fired you long back ... after you stabbed their back by falsely implicating them on the misuse of visa. unfortunately infy is an indian company and indians don't stab.. even in the front. that's what hypocrites like you take advantage of. Hope they learn the rule of Tit for Tat. I just wish you were here in India. we would have taken *good* care of you."

(Exhibit 11) Mr. Palmer did a LinkedIn search of this person and found the profile on Mr. Mankar and learned that he is an Indian National and advocate of Infosys. (Exhibit 8 -- Depo. Palmer p. 265) (Exhibit 26—Palmer Affidavit)

On December 14, 2011, another death threat was sent to Mr. Palmer which stated the following:

"This is just a short email to you, and i keep it brief.

It is people like you that make us indians angry. why must you drag us down to poverty. you fat lazy, greddy american-

burn in your hell and death to you and family. Infosys rules the world."

(Exhibit 12) Mr. Palmer was able was able to trace this email by the metadata to Sachin Ashok Pandhare who is an Infosys Delivery Manager. Sachin was responsible for sending many B1 workers to the United States for client work. (Exhibit  26—Palmer Affidavit) (Exhibit 8--Depo. Palmer, p. 268)

O.  Infosys Threatens to Fire Palmer for Cooperating with Federal Agents

When Infosys learned that Mr. Palmer was cooperating with the Federal authorities and that he had substantial documentation of the crimes on his laptop, Infosys demanded that he send the laptop to Infosys. When he refused, one of Infosys' lawyers, Steve Jonas, sent an email threatening to discipline or terminate Mr. Palmer if he did not turn over the laptop to Infosys. (Exhibit 23) Mr. Friedel confirmed that Steve Jonas, of the law firm Wilmer Hale, was retained by Infosys in all matters involving the U.S. Attorney for the Eastern District of Texas and the investigators with the State Department of Homeland Security. (Exhibit 2--Depo. Friedel pp. 99, 100)


P.  Infosys Places Palmer "On The Bench"

On April 4, 2004, Axis Capital cancelled its contract with Infosys. Instead of assigning Mr. Palmer to another project, Infosys placed Mr. Palmer "on the bench." In the IT world, "on the bench" is the term used to describe an employee between assignments. The employee earns a salary, but stays at home.

Infosys confirmed that it is not the company's economic interest for someone to be on the bench too long. (Exhibit 6--Depo. Kidd p. 7)  (Exhibit 1—Depo. Allen p. 117) In addition, the average time on the bench is 36 days. (Exhibit 1--Depo. Allen pp. 107) This would be particularly true in Mr. Palmer's case since he was billed out to clients well above his salary, bonuses and expenses. Yet no Infosys employee could give an explanation as why Mr. Palmer is still on the bench. (Exhibit 8—Depo. Grant  p. 83) (Exhibit 1--Depo. Allen pp. 155, 156) (Exhibit 6--Depo. Kidd p. 37-38)

Lisa Kidd is the Associate Vice President of Human Resources and oversees all of the talent acquisition team, compensation and benefits, employee relations, compliance and immigrations for the Americas region, so that's U.S., Canada, Mexico and Brazil. (Exhibit 6--Depo. Kidd p. 4) Talent acquisition means all of the recruiting and staffing into Infosys in the Americas. (Exhibit 6--Depo. Kidd p. 5) Mr. Kidd confirmed that Infosys is actively recruiting people today; hiring people; applying for visas today; not laying off any employees; and there is work for people to be doing. (Exhibit 6--Depo. Kidd p. 37-38) Thus there is no logical reason for Mr. Palmer to be on the bench other than to retaliate and harass Mr. Palmer.

Retaliation is consistent with a conversation Mr. Palmer had with Baljeet Singh when Mr. Palmer tried to move into the Oracle practice. Baljeet told Mr. Palmer that nobody wanted him on a job site because he was suing Infosys. (Exhibit 8—Depo. Palmer p. 192) Baljeet also told John Murphy "why would I want to hire someone into the practice who is suing the company?" (Exhibit 1--Depo. Allen pp. 75, 76) Also, Mr. Palmer was also told not to come to Kellogg project by Arthi because they didn't want him there. (Exhbit 8--Depo. Palmer p. 257)

It has now been 14 months and Infosys refuses to put Mr. Palmer on an assignment. It is clear, or at least reasonable to conclude, that Infosys is never going to let Mr. Palmer work again and that they are just paying his salary until this case and the criminal cases are concluded.

Q.  <u>Palmer is Cutoff from Infosys' System</u>

"System Access" is the term used to describe the ability of Infosys employees being able to use the company's internal websites and email. Without system access an employee cannot receive or answer emails, submit a time card, look for a project, change/edit insurance information, further his education, communicate with project teams, submit a request travel, or in short be involved in any way with the company. In an essence, without system access it is essentially the same as not working for the company. (Exhibit 26—Palmer's Affidavit)

The loss of system access for Mr. Palmer started happening in June of 2011, two months after he was placed on the bench. Mr. Palmer made numerous requests to reestablish access and Infosys temporarily allowed access until August 2011 when he was shut out again. (Exhibit 8--Depo. Palmer p. 67) Mr. Palmer sent numerous emails and made numerous phone calls to try to regain system access. During one of Mr. Palmer's phone calls, Ms. Grant told Mr. Palmer that Steve Jonas, Infosys' criminal defense lawyer, did not want Mr. Palmer to have access because he was cooperating with the federal authorities. (Exhibit 8--Depo. Palmer p. 59)

On April 18th 2012, while in Dallas to witness depositions in this case, Mr. Palmer went to Infosys' office in Plano and met with Rajesh Prasad to try to gain system access. Mr. Palmer had system access for two days and then he was locked out again. Mr. Palmer has contacted Rajesh and Lynne Grant several times, but was completely shut out on May 22, 2012. Since that date, no one has responded to Mr. Palmer or helped get him system access. Mr. Palmer testified that even on the few recent days he had access, he was not able to access information that he had before he blew the whistle. (Exhibit 26—Palmer's Affidavit)

21

As a leader in Information Technology and software, one would think Infosys could access Mr. Palmer if Infosys wanted to. Even Ms.Kidd thought it was something that could be done remotely because most people can get it done remotely. (Exhibit 6-- Depo. Kidd p. 21) Thus, the inescapable conclusion is that Infosys does not want Mr. Palmer to have access to Infosys' system, just like Ms. Grant said.

R.  Infosys Publically Disparages Mr. Palmer for Giving Statement to U.S. Senate Subcommittee

In the spring of 2011, Mr. Palmer was contacted by U. S. Senator Charles Grassley's office wanting more information regarding his case with Infosys, which Mr. Palmer did. Senator Grassley serves on the Senate Judiciary Subcommittee on Immigration, Refugees and Border Security and at his request, Mr. Palmer prepared a Statement that Senator Grassley presented and filed at the July 26, 2011, Hearing of the Senate Judiciary Subcommittee on Immigration, Refugees and Border Security on "The Economic Imperative for Enacting Immigration Reform." (Exhibit 26—Palmer's Affidavit)

That afternoon, Infosys issued and disseminated what its Spokesperson and VP of Marketing, Paul Gottsegen, referred to as a "reactive statement." (Exhibit 3--Depo. Gottsegen p. 31) (Exhibit 21) This statement accused Mr. Palmer of lying to the Subcommittee. Specifically, Infosys said Mr. Palmer's statement was "full of inaccuracies, exaggerations and falsehoods." It went on to state the following:

> "Mr. Palmer is obviously intent on spreading his falsehoods about Infosys and our business practices as broadly as possible in order to advance his object of getting as big a payout as he can from the company."

22

Predictably, the press printed this information and numerous articles came out similar to Exhibit 8 to Mr. Gottsegen's deposition where the headline read "Whistleblower a liar, fortune-hunter, retorts Infosys."

As it turns out, this press statement was not a knee-jerk reaction by a Marketing VP. The contents came from Infosys legal department. According to Mr. Gottsegen, the lawyers involved in drafting and submitting the statement were Mr. Friedel, the company Attorney; Mr. Jonas, the lawyer defending the criminal matters; and Mr. St. Clair, the lawyer defending Infosys in Mr. Palmer's civil suit. (Exhibit 3--Depo. Gottsegen p. 27, 36,46)  When Mr. Gottsegen was asked to point out anything he thought Mr. Palmer stated to the Senate Subcommittee that was inaccurate, exaggerated or a falsehood, he was instructed to and refused to answer the question based on the attorney/client privilege. (Exhibit 3--Depo. Gottsegen p.38)

Here, all Mr. Palmer did was cooperate with a United States Senator and provide information to Senate Judiciary Subcommittee on Immigration, Refugees and Border Security and then gets publically attacked by Infosys' lawyers in an obvious attempt to discredit him.

S.   Whistleblower Team HR Conducts Bogus Investigation

Mr. Palmer received some general email responses to his Whistleblower Complaint from Infosys' "Whistleblower Team" stating that they were looking into his reports. What Mr. Palmer did not know at the time, but learned during discovery in this case, is that his complaint did not go to an independent Whistleblower Team. Instead, it went to the legal team in Bangalore. (Exhibit 2--Depo. Friedel p. 43) (Exhibit 14) The

scope of the investigation of these crimes was also determined by the legal team

internally working with Infosys' external counsel. (Exhibit 2--Depo. Friedel p. 72)

According to Mr. Friedel, Infosys used the WilmerHale law firm to conduct the

investigation into these matters. (Exhibit 2--Depo. Friedel pp. 44,122) WilmerHale is

very law firm Infosys hired to defend the company with respect to any potential criminal

administrative claims that may be made against Infosys regarding immigration violations.

(Exhibit 2 --Depo. Friedel pp. 99, 100) and the one involved in falsely accusing Mr.

Palmer of lying to the Senate Subcommittee.


T.   <u>Mitch Allen's Investigation</u>

Mitch Allen is a Birmingham employment lawyer who was hired by Infosys at

Mr. St. Clair's direction shortly before this lawsuit was filed. (Exhibit 1—Depo. Allen p.

8) According to Mr. Allen, he was retained to investigate Mr. Palmer's claims of

harassment, retaliation and discrimination. (Exhibit 1—Depo. Allen p. 7) The scope of

his relationship is not clear because despite a subpoena for his records, Mr. Allen refused

to produce his letter of representation. What is clear is that Mr. Allen was far from a

neutral, independent counsel. In fact, Infosys did not let Mr. Allen interview key

witnesses until corporate counsel or HR could talk to them first. (Exhibit 1—Depo. Allen

p. 16)

Mr. Allen, however, testified that Mr. Palmer suffered in unacceptable ways.

- He confirmed that no employee should be asked to write an illegal letter
  and that Mr. Palmer should not have suffered any retaliation or

harassment for refusing to sign what could be deemed as an illegal letter.
(Exhibit 1--Depo. Allen p. 31)

- Mr. Allen also testified that the phone calls or threats were "absolutely" inappropriate, retaliatory and that Infosys needed to take steps to steps to prohibit this type conduct. (Exhibit 1-- Depo. Allen p. 102)

- Mr. Allen also agreed that no employer should be threatening to fire an employee for cooperating with the federal authorities regarding crimes that that company had committed. (Exhibit 1 --Depo. Allen pp. 149, 150)

- He further stated that he would feel threatened if he in that circumstance would feel like that would be harassment and it would be a bad situation for Mr. Palmer. (Exhibit 1--Depo. Allen pp. 147, 148)

- He also testified that based on his investigation, that is was understandable that anybody in Mr. Palmer's position, would understandably be nervous, upset, scared, and worried about his safety and the safety of his family based upon these threats. (Exhibit1--Depo. Allen pp. 101)

- With respect to Mr. Palmer being on the bench, Mr. Allen was led to believe by Infosys in June of 2011 that Mr. Palmer would be put in a job sometime in the future. Mr. Aalen did not even know that Mr. Palmer was still on the bench when he gave his deposition on March 29, 2012. (Exhibit 1 --Depo. Allen pp. 107)

- Mr. Allen agreed that Mr. Palmer did the right thing by reporting the violation and cooperating with Homeland Security, the state department,

U.S. attorney for the Eastern District, Department of Justice, Senator

Grassley, IRS, and many other agencies.

U.  <u>Marti Harrington fears retaliation and leaves Infosys.</u>

Marti Harrington was employed by Infosys and managed Infosys' project at

Johnson Controls. She testified by affidavit about her bad experience with Infosys after

she discovered Infosys was misusing B-1 visas. (Exhibit 17) She stated the following:

> In February of 2011, I became fully aware of the issues with the Visa fraud. I began getting phone calls from various company legal councilors, wanting to know what I knew about the VISA usage. At the time, I tried very hard to ignore the issue. Eventually, I looked at the list I had of Infosys employees on the JCI Maximo project and their VISA status. This was the very list Jay had requested and I provided in the fall of 2010. I also did some reading on US VISAs and immediately realized there was misuse. While I was in fear of company retaliation, I sent an email to our whistle blower account and immediately started getting phone calls from Infosys lawyers.

> Additionally, two federal agents contacted me as well as Jay's attorney prior to my submitting the whistleblower email. Jay's attorney was seeking my permission to give my contact information to the federal agents. The agents wanted details about my involvement with Infosys's VISA process and the list I had sent to Jay. In addition to being afraid of losing my job, I was now afraid that because of my association with Infosys that I had committed a crime against the United States.

> Calls from attorneys continued but the agents stopped contacting me soon after I submitted my whistle blower email. After leaving Infosys, I found out the agents were not allowed to discuss issues with me without an Infosys attorney present. This large consulting company was illegally using US VISAs for their own corporate gain and they were forbidding direct contact with me by the US government because I (a US citizen) worked for a company based in Indian.

> The more I understood about the VISA issues seemed to get me in more trouble. JCI found out about the VISA issue and I was asked in the spring if anyone on the JCI project from Infosys had traveled to the US on the wrong VISA type. My answer was yes. I then went to discuss this conversation with the Infosys sales rep and he was visibly irritated with me and told me I should not have answered the question. I told him that I will not lie.

V. <u>Infosys Employees Confirm Mr. Palmer's Retaliation and Emotional Distress</u>

Stephanie Teasdale is a former employee of Infosys who testified by affidavit.

(Exhibit 29) She was hired into the Infosys organization to develop and implement the

affirmative action program for Infosys. She testified as follows:

> "Although I was not directly involved in the investigation on the
> whistleblower case of Jay Palmer, Lynne Grant openly discussed details of this
> and other employee relations cases on several occasions. On more than one
> occasion, Lynne stated that Infosys messed up with how they dealt with Jay
> Palmer. She admitted that Jay Palmer was the victim of death threats and
> retaliation. She also knew that he was telling the truth and the B Visas were
> being used illegally. Lynne Grant would have conversations with Jeff Friedel at a
> minimum bi- weekly, but most months, weekly. They did speak of the
> Whistleblower case often. In most situations they would ask me to leave the
> room, but several times they would speak of Jay in general terms in front of me.
> Every time admitting that he was correct, the company did misuse B visas, but
> questioned how they were going to deal with the events going on. Lynne
> ultimately was told to discontinue taking all his calls because he was "not stable."
> Lynne knew that Jay was having emotional problems with dealing with the
> retaliations. So Lynne began dodging his phone calls, even when he was
> retaliated against by not receiving his full bonus amount. She told me that she
> knew he was correct, but was told to not respond to him. Lynne then began
> ignoring Jay continuously and letting his calls go to voice mail or not answering
> his calls.
>
> Lynne also was speaking to Linda Manning about the case in the
> beginning. The two ladies used to be friends and would speak regularly and go to
> lunch. As the case progressed it became obvious that Lynne's opinion of Linda
> changed, just as it did for Jay. Linda would constantly go to Lynne about issues
> she saw or problems she was having with her direct boss Nandini or Poornima.
> Lynne started to become complacent with Linda and the issues saying she could
> not do anything about them and she was not surprised Linda found another thing
> illegal. The standing joke in HR became, what we were going to find that day
> that was illegal. Generally, I was involved in these conversations and like the
> conversations I had personally with Lynne, she would dismiss the issues saying
> "what did we want her to do" or "are you surprised?"
>
> Towards the end of my tenure with Infosys, I was working on the website
> interface for the AA team with the website developer. She was pulled off of her
> daily duties to help with the immigration team. The time frame was during the I-9
> audit. I went into the storage room where the web designer was working to
> discuss the pressing issue of the webpage and everyone stopped talking and

looked at me as if I walked to something. This made me curious as to why their behavior was out of the norm. So later that day, when the room was empty, I went into the room to see what was going on. At this time I saw several stacks on the table of I-9 forms approximately 1-2 feet in height off the table. All the forms on top of the stacks were incomplete, but signed and marked as filed. The dates were marked as previous years.

I ended up leaving the company exasperated and accepted another job with another company. I mostly felt betrayed and felt like I was a façade. Infosys never had a desire to be Affirmative Action compliant, they just wanted to appear compliant.

Ms. Manning also confirmed that Mr. Palmer reported the harassment to HR and that Ms. Grant, as the Employee Relations Manager, was in charge of Mr. Palmer's case. Ms. Manning had many conversations with Ms. Grant regarding Mr. Palmer's complaint of harassment and retaliation and, in fact, "talked about it on a daily basis." (Exhibit 7--Depo. Manning p. 34) Ms. Manning testified that "we were shocked. All of HR was shocked. The Americans kind of sit right there together and we all knew what was going on. Illegal activities on a daily basis was pretty common at Infosys and Jay's case was -- to me, it was appalling that the managers were able to -- I mean, he had death threats. He had a letter left on his chair at his office. You know, we talked about it, yeah. He was just harassed." (Exhibit 7--Depo. Manning p. 41)

Ms. Harrington also witnessed Infosys employees harassing Mr. Palmer. She stated that "Infosys employees harassed Jay in my presence, discriminated against me, conducted business in the US illegally and I'm still worried they will seek retaliation against me for being honest." (Exhibit 17)

W. Infosys has Failed to Pay Mr. Palmer his Bonuses since  blowing the whistle

In the middle of 2011, Mr. Palmer got a bonus, but it was not the correct amount. (Exhibit 8--Depo. Palmer p. 112) Since Mr. Palmer has been on the bench for 14 months, he has not been able to do any work and earn a bonus. Therefore, when Infosys paid bonuses in May, 2012, Mr. Palmer did not get one. (Exhibit 26—Palmer Affidavit)

X.  Tax Fraud

Everyone working in the United States is subject to federal income taxes. At Infosys, American employees, H-1Bs and Green Card holders working in the United States would be in its pay system. The pay system is the mechanism by which the employees are actually paid and taxes are withheld. (Exhibit 7--Depo. Manning p. 33) The B-1s, however, were not included in Infosys pay system, so no taxes would have been withheld. (Exhibit 7--Depo. Manning p. 34) This violation is being investigated by the IRS and Mr. Palmer is a cooperating witness.

Y.  Mr. Palmer Suffered Severe Emotional Distress.

Based on the above, it is understandable that Mr. Palmer, or anyone in his shoes, would suffer severe emotional distress. As a result of undergoing this trauma, Mr. Palmer has to take Pristiq for anxiety (Exhibit8 --Depo. Palmer p.9) and occasionally takes Xanax. (Exhibit 8--Depo. Palmer p. 154) He testified about his depression and difficulty getting out of bed on some occasions. (Exhibit 8--Depo. Palmer p. 206)  He also gets nervous, gets scared, and even walks around with a pistol out of fear for himself and his family and that he has anxiety attacks and panic attacks because of this. (Exhibit 8--Depo.

Palmer p. 202) He also worries about financial problems from not getting his bonuses and the uncertainty of his future. (Exhibit 8--Depo. Palmer p.44)

He described being devastated when he was falsely accused me of being a liar and a fortune hunter and being publically ridiculed when all he did was provide truthful statements to a Senate Sub-committee at a U. S. Senators' request.

He also testified that he has become very moody since this has happened and further described the distress as follows:

"All the stress that goes on with knowing what is going to happen with me or not happen with me. I have been threatened by attorneys, Infosys attorneys, been threatened to be fired. I have been threatened by people within Infosys. I have begged for help. I sent e-mail after e-mail to Lynne and Jeff and other people asking them to take me out of the hostile work environment and nothing has happened, nothing. They have done nothing after they promised me we will take care of you, do the right thing, tell the truth. After I followed the whistleblower policy, I followed it, cooperate with the Federal Government, and I sit back and I lose -- I am not working, I am not even having the opportunity to

(Exhibit 8--Depo. Palmer p. 201)

Mr. Palmer worries because, like most Whistleblowers, he believes he is now blackballed in the industry.  He has sent out resumes but cannot get a job in the industry. (Exhibit 8--Depo. Palmer p. 203-208)

V.    ARGUMENT

**A. Count I—Breach of Contract**

It is undisputed that Mr. Palmer's contract allowed him to earn bonuses up to 30% of his salary. As set out above, Infosys' has deliberately cut Mr. Palmer's bonuses

because he filed a Whistleblower Complaint. Now that he is on the bench and has been so for 14 months he has lost the ability to hear any bonuses.

## B.  Count II--Intentional Infliction of Emotional Distress/Outrage Claim

The tort of "intentional infliction of emotional distress," or "outrage" as it is often called, was adopted by the Supreme Court of Alabama in *American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980). That court defined the tort as follows:

> We therefore join with our sister states of Maryland, Massachusetts, Missouri, Tennessee, West Virginia, Georgia, Washington, Florida, California and New York in appreciating that willful wrongs, or those made so recklessly as to equate willfulness, authorize recovery in damages for the mental suffering caused thereby, and *we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.* The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement, supra, at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra, at 72. See also Prosser, Law of Torts (4th ed.) at 56-60 and Wade, supra, for instances which clearly fall within the principle. (emphasis added)

The Alabama Supreme Court also noted that "an employer, by virtue of his position, possesses no roving license to treat his employee in an extreme and outrageous manner, whether before, during or after their relationship. *Id.* at 364.

In 1982, the Eleventh Circuit upheld a jury verdict on an outrage claim under Alabama law in an employment case not involving sexual harassment. *Holmes v. Oxford Chemicals, Inc., a Div. of Consol. Foods Corp.*, 672 F.2d 854 (11th Cir. 1982). In *Holmes,* the Administratrix of an employee's estate brought an action against his

employer for the tort of outrage arising from the arbitrary reduction of the employee's monthly disability payment, from $500 to $49.10. The employer admitted that the company did this in order to put "the onus" on the disabled employee to take all steps necessary to get his Social Security benefits, even though the employer's disability plan did not authorize the employer to reduce plaintiff's monthly check in anticipation that plaintiff might at some later date receive Social Security benefits. The jury returned a verdict for the plaintiff, Judge Truman Hobbs denied a motion for a J.N.O.V. and the Eleventh Circuit affirmed, concluding that the Judge Hobbs "properly construed this newly recognized right of action for a tort of outrage by the Alabama Supreme Court." *Id.* at 857. In doing so, the Eleventh Circuit stated the following:

> Here, of course, as we have noted, Consolidated was not insisting upon its legal rights in a permissible way. It was insisting on a policy that was strictly in violation of its contract with the employee. As stated by the trial court: "Under the plain language of Consolidated's disability agreement with its employees, Consolidated had no right to slash plaintiff's disability income in the hope that such drastic action might force plaintiff to seek Social Security benefits."

*Id.* The Eleventh Circuit also noted that the employee suffered "severe depression, emotional stress and physical weakness" and that there was ample evidence from "medical and lay persons that after the arbitrary reduction of his monthly payment from $500 to $49 Holmes suffered severe depression, emotional stress and physical weakness. He testified that this occurrence 'devastated' him." *Id.* at 857, 858. Mr. Palmer will present similar testimony and also will produce numerous emails he sent to Infosys' Human Resources Department expressing the emotional, financial, personal and professional devastation Infosys was causing.

Judge William Steele of the Southern District of Alabama denied a 12(b)(6)

motion in an "outrage" employment case that did not involve sexual harassment. *Lees v.*

*Sea Breeze Health Care Ctr., Inc.,* 391 F. Supp. 2d 1103, 1107-08 (S.D. Ala. 2005) Even

though this was not a summary judgment ruling, Judge Steele's analysis is persuasive,  In

*Lees,* the employee alleged that her employer and supervisors engaged in a pattern of

harassment and retaliation against her after she notified them that she had enlisted in the

United States Air Force Reserves and would need to miss work to attend basic training.

Among other things, Ms. Lees also alleged the following:

> [U]pon presenting her orders, defendant Adams threw the papers in Lees' face, stated "what am I going to do for the next three months?" and indicated that Lees was "inconsiderate and selfish for joining the service." (Second Amended Complaint, ¶ 8.) Adams allegedly continued making similar comments to Lees until August 2003, when Lees left for basic training. (*Id.,* ¶ 9.) During plaintiff's absence for active military duty in late 2003, Adams allegedly made a series of remarks to others at Sea Breeze, indicating that Lees would not have a job when she returned from active duty, complaining that Lees was missing work as a result of her military service, and opining that Lees' actions reflected disregard for her job. (*Id.,* ¶¶ 10-11.) When Lees returned in late December 2003, Adams allegedly subjected her to an ongoing barrage of comments that Lees was "inconsiderate for joining the service" and "inconsiderate toward [her] job." (*Id.,* ¶ 12.)
>
> According to the Second Amended Complaint, defendant Smith began interviewing job applicants on Sea Breeze's behalf in March 2004, intimating that a position would become available soon because its present occupant, who had joined the military at age 34 without informing others of her plans, would be terminated. (*Id.,* ¶ 13.) Smith further allegedly informed applicants that Lees was "gung-ho military," that "Sea Breeze wasn't on her mind," that she didn't know why Lees decided to join the military at her age, and that Lees was selfish for doing so. (*Id.,* ¶ 14.) Plaintiff alleges that her employment at Sea Breeze was ultimately terminated in April 2004 because of her membership and service obligations in the military. (*Id.,* ¶ 15.)

391 F. Supp. 2d at 1104-05

Judge Steele, citing  *American Road Service Co. v. Inmon,* 394 So.2d 361, 364

(1981), noted that "ever since the inception of the outrage doctrine, Alabama courts have

recognized the viability of such claims in the employment context in appropriate circumstances. Indeed, the law is clear that 'an employer, by virtue of his position, possesses no roving license to treat his employee in an extreme and outrageous manner, whether before, during, or after their relationship.'" The following analysis of Alabama law by Judge Steele on pages 1107 and 1108 is very persuasive:

> "Review of pertinent Alabama authorities reveals that the line of demarcation between non-actionable outrage claims and actionable outrage claims in the employment arena is found in the determination of whether the termination is for reasons that contravene public policy. Where a plaintiff complains that her discharge contravenes public policy, particularly if the discharge was the culmination of a protracted pattern of discrimination in violation of public policy, she may properly pursue a claim of outrage because the violation of public policy furnishes the requisite "sound of fury" to accompany the termination. *Smitherman*, 872 So.2d at 840 (outrage claim not cognizable if termination is "not for a reason which contravenes public policy," and if termination was not accompanied with "sound of fury") (quoting *Harrell*, 495 So.2d at 1387); *see also Wyatt v. BellSouth, Inc.*, 998 F.Supp. 1303, 1312 (M.D.Ala.1998) (under Alabama law, "the discharge of an employee rises to the level of the tort of outrage only if the discharge violates public policy"). Alabama courts have construed this standard to authorize outrage claims where a plaintiff is complaining about discrimination in retaliation for exercising the fundamental right to marry, or about intrusion on her federally protected right to be free from gender discrimination. *See Rice v. United Ins. Co. of America*, 465 So.2d 1100, 1102 (Ala.1984) (trial court erred in dismissing outrage claim where pregnant employee claimed employer discriminated because of her pregnancy by engaging in a pattern of conduct over a period of several months aimed at forcing her to leave her job, thereby violating plaintiff's federally protected right to be free from discrimination based on sex); *Cunningham v. Dabbs*, 703 So.2d 979, 983 (Ala.Civ.App.1997) (finding jury question on outrage claim where plaintiff did not claim wrongful discharge of at-will employee, but instead alleged a pattern of harassment and a termination of employment in violation of her fundamental right to marry)." (footnotes omitted)

Judge Steele then applied the law as it related to Ms. Lees complaint and stated the following:

> The Court harbors no doubt that a ten-month onslaught of harassment, a slew of adverse repercussions, and a firing, all because the plaintiff had enlisted in the U.S. Air Force Reserves, would offend public policy, as expressed in USERRA. If Lees is able to prove a set of facts establishing that this sequence of events is, in

fact, what occurred, and that defendants' acts were motivated by discriminatory animus against her military status, then she could conceivably prevail on her outrage cause of action. At this nascent stage of the proceedings, the Court cannot rule out the possibility that Lees may be able to prove such a set of facts. Accordingly, she will be permitted to proceed on her outrage claim, and defendants' request to dismiss that claim for failure to state claim upon which relief can be granted is denied.

The alleged outrageous conduct in each of those cases, as well as the cases relied on by Infosys, pale in comparison to what has happened and is continuing to happen to Mr. Palmer. Mr. Palmer was thrown into a situation where he learned that his employer was committing serious crimes and cheating our country out of hundreds of millions of dollars through visa and tax fraud and could change its entire business model. Also, Infosys runs the risk of substantial penalties and administrative fines stemming from the criminal and Agency investigations. Infosys' motives for attacking Mr. Palmer are clear and the fact that some of the most egregious conduct was orchestrated by Infosys' lawyers is certainly more "outrageous" than any case to come before the Federal Courts or the Alabama Supreme Court.

Infosys' wrongful conduct clearly meets the minimum definition of "extreme and outrageous conduct."  Like the employer in *Holmes*, "Infosys was not insisting upon its legal rights in a permissible way. It was insisting on a policy that was strictly in violation of its contract with the employee" and more importantly the law. As noted by Judge Steele where a plaintiff complains that the outrageous conduct "contravenes public policy" he may properly pursue a claim of outrage because the violation of public policy furnishes the requisite "sound of fury." Infosys' conduct here was to stifle and intimidate Mr. Palmer and others from reporting serious Federal crimes. It is difficult to imagine a

35

clearer violation of "public policy." Finally, Mr. Palmer has alleged and will produce medical and lay testimony proving he has suffered "severe emotional distress." Accordingly, Mr. Palmer has alleged more than "enough facts to state a claim to relief that is plausible on its face."

Mr. Palmer's testimony alone is substantial evidence that he has suffered "severe emotional distress." In addition, Infosys employees even recognized that Mr. Palmer was suffering emotional distress from the toll this was taking on him. On October 15, 2010, Ms. Manning sent Mr. Palmer an email in which she stated "don't get down, it's going to be fine." She said she sent it because Mr. Palmer "was a wreck." (Exhibit 7--Depo. Manning p. 46, 47) Stephanie Teasdale testified that Lynne Grant ultimately was told to discontinue taking all his calls because he was "not stable."(Exhibit 29)  Finally, Mr. Allen also testified that based on his investigation, that is was understandable that anybody in Mr. Palmer's position, would understandably be nervous, upset, scared, and worried about his safety and the safety of his family based upon these threats. (Exhibit1-- Depo. Allen pp. 101)

Based on the above, Mr. Palmer has submitted more than enough facts to submit this claim to a jury.

## COUNT III--Hiring, Training Monitoring and/or Supervising Whistleblower Team

When Mr. Palmer filed this claim, he thought that Infosys' Whistleblower team negligently failed to review and respond to his Whistleblower Complaint. The facts now show that there was simply too much at stake for Infosys to voluntarily change its illegal practices and that the lawyers for Infosys were never going to allow a fair investigation.

Frankly, the facts are really more in line with the intentional claim for "outrage" than a negligent training and is due to go out.

### C.  COUNT IV--Hiring, Training Monitoring and/or Supervising HR Employees

Mr. Palmer recognizes that in order for him to be successful on his negligent or wanton supervision and hiring claims, he must prove underlying wrongful conduct by Infosys. *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820 (Ala.1999). *Voyager Ins. Companies v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003). The negligent conduct is set out in paragraph D, below. This claim arises out of Mr. Palmer reporting the harassment to Infosys' HR Department and begging for help. However, HR did not do anything to protect Mr. Palmer or enforce the Whistleblower Policy's prohibition of retaliation against a Whistleblower. According to Ms. Manning, Ms. Grant "didn't take care of things. She didn't do what she was supposed to do. She just ignored it. She just kind of let it go. She would talk to Jay sometimes. Sometimes she'd say, oh, Jay's calling again and she wouldn't answer the phone. You know, I'd be standing at her desk and I'd see Jay's call come through and she would not pick up. (Exhibit 7--Depo. Manning p. 42, 43)

### D.  COUNT V--Negligent, Wanton and/or Intentional Misconduct

*In Armstrong Bus. Servs., Inc. v. AmSouth Bank,* 817 So.2d 665, 679-680 (Ala.2001) the Alabama Supreme court set out the elements negligence and wantonness that appropriately apply to this case.

The elements of a negligence claim are a duty, a breach of that duty, causation, and damage. *AALAR, Ltd., Inc. v. Francis,* 716 So.2d 1141, 1144 (Ala.1998). At common law, a duty of due care can accompany a contractual obligation; *see Pugh v. Butler Tel. Co.,* 512 So.2d 1317, 1319 (Ala.1987). In addition, a duty of due care can arise in the absence of a contract, based on "a number of factors, including public policy, social considerations, and foreseeability [of harm]." *Smitherman v. McCafferty,* 622 So.2d 322, 324 (Ala.1993). "The ultimate test of the existence of a duty to use due care is found in the foreseeability that harm may result if care is not exercised." *Buchanan v. Merger Enters., Inc.,* 463 So.2d 121, 126 (Ala.1984). "Due care is relative always and much depends upon the facts of the particular case." *Cox v. Miller,* 361 So.2d 1044, 1048 (Ala.1978).

This Court has defined "wanton conduct":
" '[The] doing of some act or something with reckless indifference to the consequences of said act, or ... a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without *680 any actual intent to injure is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property.' "

Here, Infosys' Whistleblower Policy (Exhibit 33) specifically prohibits discrimination, retaliation or harassment of a whistleblower. Thus, Infosys was under a duty to protect Mr. Palmer. Infosys clearly breached this duty, especially considering that some of the most egregious harassment came from Infosys own lawyers. As a result, Mr. Palmer has lost money and suffered as outlined above.

## E.  COUNT VI--Legal Misrepresentation/Fraud

"Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."*Ala. Code* § 6-5-101. *Southland Bank v. A & A Drywall Supply Co., Inc.,* 21 So. 3d 1196, 1212 (Ala. 2008) The Whistleblower Policy represents to Infosys' employees that they will be protected if they report crimes. In fact, Ms Grant confirmed that Infosys, at least on

paper, has a strict policy against Retaliation the policy gives some confidence of thinking that if you see some form of a crime, you can report it to the company without any form of retaliation. She further testified that an employee could rely on that statement from Infosys that he has the freedom to report crimes without any fear of any form of retaliation or harassment, correct-- (Exhibit 4--Depo. Grant p. 75) However, the facts prove that the representation is simply not true. Mr. Palmer, Ms. Manning, Ms. Harrington all filed Whistleblower Complaints reporting crimes and also suffered in various degrees for doing so.

VI.    CONCLUSION

Based on the above, Mr. Palmer respectfully submits that the undisputed facts prove each of his claims other than the negligent training of the Whistleblower Team which was basically a farce. At the very least he has produces substantial evidence and the Motion for Summary Judgment should be denied.

Respectfully submitted,

KENNETH J. MENDELSOHN (MEN001)

OF COUNSEL:
JEMISON & MENDELSOHN, P.C.
1772 Platt Place
Montgomery, Alabama 36117
(334) 213-2323
(334) 213-5663 Fax

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served on all parties of record via electronic filing and hand delivery on this the 4th day of June 2012.

_____
OF COUNSEL

Jay St. Clair
Anna Curry Gualano
Jennifer F. Swain
LITTLER MENDELSON, P.C.
Wells Fargo Tower
Suite 2300
420 20th Street No.
Birmingham, AL      35203-3204
jstclair@littler.com
agualano@littler.com
JSwain@littler.com